825 P.2d 1081

STATE of Idaho, Plaintiff–Respondent,

v.

David Leslie CARD, Defendant–Appellant.

No. 18313.

Supreme Court of Idaho,
Caldwell March 1991 Term.

Dec. 31, 1991.

Rehearing Denied Feb. 21, 1992.

Van G. Bishop, Canyon County Public Defender, Nampa, for appellant.

Larry J. EchoHawk, Idaho Atty. Gen., Lynn E. Thomas, Sol. Gen., argued, Boise, for respondent.

## ON DENIAL OF REHEARING

BOYLE, Justice.

This is an appeal from the first degree murder convictions and death sentences imposed on David Leslie Card for the murders of Eugene and Shirley Morey. In addition to the automatic review required of death penalty cases by I.C. § 19-2827, Card raises many issues on appeal including the constitutionality of the legislative abolishment of the insanity defense, the constitutionality of the "utter disregard for human life" language contained in I.C. § 19-2515, the limitation on post-conviction relief petitions in capital cases, and the effect of a victim impact statement contained in the presentence report.[1]

## I.

According to the record, during the early morning hours of June 5, 1988, Card was in a Circle K convenience store in Nampa, Idaho, and had an argument with the night clerk about death and seeing people die. After the clerk ordered him out of the store, Card went home and retrieved a revolver. Card later returned to the store and found that the clerk with whom he had argued was not working. He then approached a vehicle parked near the store and shot and killed Eugene and Shirley Morey as they were folding newspapers for their morning paper route. According to the record, Card later told a jail cellmate that he originally intended to kill the clerk, but killed the Moreys simply because they were there.

Shortly after Card was charged with two counts of murder, his appointed counsel and the prosecuting attorney filed motions to determine whether Card had the mental capacity to understand the proceedings against him. The district court ordered evaluations of Card by Dr. Mac Webb, a psychologist, and Dr. Michael Estess, a psychiatrist. Both experts agreed that Card, at that time, did not have the mental capacity to understand the proceedings against him and to assist counsel in his defense. On the basis of those evaluations Card was found incompetent to stand trial and was committed for treatment and evaluation for ninety days pursuant to I.C. § 18-212. During the course of treatment Card was found to be suffering from a type of paranoid schizophrenia and he re-

---

1. Many of the issues raised by Card have been extensively addressed in other recent cases decided by this Court, *e.g. State v. Rhoades (Baldwin)* 120 Idaho 795, 820 P.2d 665 (1991); *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990). In addition, the recent decision of the United States Supreme court in *Payne v. Tennessee,* — U.S. —, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), resolves the victim impact statement issue raised by Card on this appeal.

sponded well to medication and treatment. With the treatment Card received he was subsequently adjudged competent to stand trial.

One of Card's primary defenses at trial was that he did not have the mental capacity to form the specific intent necessary to commit first degree murder. Two licensed psychiatrists testified in his behalf at trial and expressed opinions that Card suffered from paranoid schizophrenia and as a result of this mental defect had a difficult time distinguishing reality from illusion. Notwithstanding this testimony, the jury found Card guilty of two counts of first degree murder.

A sentencing hearing was held in which the two psychiatrists who testified at trial also testified concerning Card's mental condition. These expert witnesses testified that Card definitely suffered from a form of mental illness but that his prognosis for treatment was good. A presentence report was submitted to the district court which, among other information, contained a summary of statements made to the presentence investigator concerning the impact of the murders on the Morey family.

After considering the evidence presented at the sentencing hearing the district judge found two aggravating circumstances existed that justified the imposition of the death penalty. First, at the time of each murder the defendant also committed another murder. I.C. § 19–2515(g)(2). Second, that by the murders or circumstances surrounding their commission the defendant exhibited utter disregard for human life. I.C. § 19–2515(g)(6). The trial court also determined that the facts supported a finding of several mitigating circum-

stances. However, the trial court found that the mitigating circumstances did not outweigh either of the aggravating circumstances, and imposed the death penalty. This appeal followed, and we affirm.

## II.

Card asserts that I.C. § 18–207 is unconstitutional because it violates his constitutional rights to due process and the right to be tried by a jury. Card claims that the insanity defense is so fundamental to our system of justice that its abolishment constitutes a denial of a fundamental constitutional right.

■ In *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990), we considered the fundamental nature of the insanity defense and addressed the constitutionality of I.C. § 18–207. In *Searcy* we held:

Accordingly, we conclude, based upon the foregoing authorities, that due process as expressed in the Constitutions of the United States and of Idaho does not constitutionally mandate an insanity defense and that I.C. § 18–207 does not deprive the defendant Searcy of his due process rights under the state or federal Constitution.

118 Idaho at 637, 798 P.2d at 919 (citations omitted) (opinion of Bakes, C.J., Boyle, J. and Woodland, DJ. Pro Tem.)[2] In *State v. Searcy* we cited to the United States Supreme Court's opinion in *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), and quoted the following:

[T]his [C]ourt has never articulated a general constitutional doctrine of *mens rea*. We cannot cast aside the centu-

---

**2.** Card has questioned the validity of Supreme Court decisions wherein pro tem district judges sit in the place of a member of this Court. Idaho Constitution art. 5, § 6 provides that "[i]f a justice of the Supreme Court shall be disqualified from sitting in a cause before said court, or be unable to sit therein, by reason of illness or absence, the said court may call a district judge to sit in said court on the hearing of such cause." This section gives the appointed pro tem district judge the same authority and powers as a Supreme Court Justice for the cause in which he or she is sitting. In *First National Bank v. Crane Creek Sheep Co.*, 47 Idaho 149,

273 P. 945 (1928), a district judge acting as a pro tem Justice wrote the opinion of the Court. The Idaho Supreme Court stated that "this court has the power to call a district judge to sit in a cause in place of a justice ... and, in such a case, the district judge possesses all the power of a justice of the supreme court with respect to the cause." 47 Idaho at 156, 273 P. at 947. Thus, the decisions of the Idaho Supreme Court in *Searcy* and *State v. Rhoades (Baldwin)*, 120 Idaho 795, 820 P.2d 665 (1991), as well as any other cause heard by this Court is not diminished in any respect because of the appointment and participation of a pro tem Justice.

ries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. *This process of adjustment has always been thought to be the province of the States.*

[*Powell v. Texas* ], 392 U.S. at 535–536, 88 S.Ct. at 2156, 20 L.Ed.2d at 1269 (emphasis added). Justice Marshall, in his *Powell* opinion, stated that "nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms."

118 Idaho at 636, 798 P.2d at 918 (footnote omitted).

Card claims that the recent U.S. Supreme Court pronouncement in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), mandates the allowance of an insanity defense in death penalty cases. Specifically, Card relies upon the following language from *Penry:*

The common law prohibition against punishing "idiots" for their crimes suggests that it may indeed be "cruel and unusual" punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions. Because of the protections afforded by the insanity defense today, such a person

is not likely to be convicted or face the prospect of punishment.

492 U.S. at 333, 109 S.Ct. at 2954.

█ We agree with the views of the United States Supreme Court but note that the safeguard referred to in *Penry* is in place in Idaho. Under Idaho law, an individual must be found competent to stand trial. I.C. § 18–210.[3] In addition, those individuals who are incapable of forming the necessary intent needed for the crime are protected by the mens rea requirements of I.C. §§ 18–114,[4] 18–115[5] and 18–207. Finally, those "profoundly or severely retarded" individuals who do not fall under the first two protections and are convicted and who are "wholly lacking capacity to appreciate the wrongfulness of their actions" are protected by the sentencing provisions of I.C. § 19–2523. Idaho Code § 19–2523 specifically requires the sentencing court to consider "[t]he capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the offense charged." Accordingly, we hold that the absence of the insanity defense in capital cases does not violate any constitutional protections. *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990).

█ Card's argument that I.C. § 18–207 conflicts with I.C. § 18–114 and § 18–115 is also without merit. *State v. Searcy,* 118 Idaho at 635, 798 P.2d at 917. It is a fundamental law of statutory construction that statutes that are in pari materia are to be construed together, to the end that the legislative intent will be given effect. *State v. Creech,* 105 Idaho 362, 367, 670 P.2d 463, 468, *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1983). It is clear that I.C. § 18–114 and § 18–115 do

3. **18–210. Lack of capacity to understand proceedings—Delay of trial.**—No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, sentenced or punished for the commission of an offense so long as such incapacity endures.

4. **18–114. Union of act and intent.**—In every crime or public offense there must exist a un-

ion, or joint operation, of act and intent, or criminal negligence.

5. **18–115. Manifestation of intent.**—The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots or lunatics, nor affected with insanity.

not mandate the existence of a defense based upon insanity. *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985). Both I.C. § 18–114 and § 18–115 deal with the intent of the defendant at the time of the crime. While I.C. § 18–115 includes language concerning the discretion and soundness of a defendant's mind, it is clear that those elements are simply a part of all of the circumstances or conditions which manifest the intent of the defendant. Idaho Code § 18–207 removed the insanity defense as it existed previously [6] and reduced the issue of mental condition from the status of a formal defense to that of an evidentiary question. *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985). There is no conflict between these three statutes. *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990); *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985).

■ Idaho Code § 18–207 does not remove the element of criminal responsibility for the crime. The prosecution is still required to prove beyond a reasonable doubt that a defendant had the mental capacity to form the necessary intent. Idaho Code § 18–207 merely disallows mental condition from providing a complete defense to the crime and may allow the conviction of persons who may be insane by some former insanity test or medical standard, but who nevertheless have the ability to form intent and to control their actions. The statute expressly allows admission of expert evidence on the issues of mens rea or any state of mind which is an element of the crime. *See* I.C. § 18–207(b). In addition, the statutes require the sentencing judge to consider and receive evidence of the mental condition of the defendant at the time of sentencing. I.C. § 19–2523. This statutory process provides the necessary safeguards and does not offend the princi-

ples of due process as required by the Fourteenth Amendment to the United States Constitution. *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990).

■ Card asserts that the repeal of the insanity defense denies him his right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 1, § 7 of the Idaho Constitution. Specifically, Card argues that the jury, not a judge, should hear evidence that as a result of mental disease or defect he is not responsible for his criminal conduct. In light of the foregoing statutory safeguards previously cited we find Card's argument to be without merit. In Idaho a jury need only determine whether a crime has been committed. Punishment is a duty and responsibility of the trial court not the jury. *State v. Scott*, 72 Idaho 202, 239 P.2d 258 (1951); *see also Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989).

### III.

■ Card urges us to reconsider our prior ruling in *State v. Beam*, 115 Idaho 208, 766 P.2d 678 (1988), *cert. denied*, 489 U.S. 1073, 109 S.Ct. 1360, 103 L.Ed.2d 827 (1989), concerning the time limitation for post-conviction relief in capital cases. Card argues that there is neither a rational basis nor a compelling state interest which justifies the existing Idaho statutory post-conviction scheme in death penalty cases under I.C. § 19–2719 and, therefore, that the statutory scheme is unconstitutional. Furthermore, Card argues that the statute creates a difficult situation for trial counsel charged with ineffective assistance during the defense of his client. Because of the statute's procedural and time limitations,

---

**6.** The Act adopting I.C. § 18–207 repealed the former versions of I.C. §§ 18–207, 18–208, 18–209, 18–213 and 18–214. 1982 Idaho Session Laws, ch. 368, at 919. Former I.C. § 18–207 set forth the elements of the insanity defense in Idaho as the following:

**Mental illness as defense**—(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either

to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
(2) As used in this act, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

This test is substantially the same test now required by the sentencing guidelines of I.C. § 19–2523.

Card argues, without actually raising an issue of ineffective counsel, that it is impossible for trial counsel charged as "ineffective" to present all of the issues on appeal as well as the issue of his or her own ineffectiveness on a post-conviction petition.

In *Beam*, we thoroughly and extensively discussed the constitutionality of I.C. § 19–2719 and held that the statute satisfied all required tests and was, therefore, constitutional. After an extensive discussion of the applicable tests to determine constitutionality, we held that the provisions of I.C. § 19–2719 did not violate any of the defendant's rights.

> In this case the legislature clearly pointed out a rational basis for I.C. § 19–2719 in the statement of purpose which accompanied the enactment of the statute. The underlying legislative purpose behind the statute stated the need to expeditiously conclude criminal proceedings and recognized the use of dilatory tactics by those sentenced to death to "thwart their sentences." The statute's purpose is to "avoid such abuses of legal process by requiring that all collateral claims for relief ... be consolidated in one proceeding...." We hold that the legislature's determination that it was necessary to reduce the interminable delay in capital cases is a rational basis for the imposition of the 42–day time limit set for I.C. § 19–2719. The legislature has identified the problem and attempted to remedy it with a statutory scheme that is rationally related to the legitimate legislative purpose of expediting constitutionally imposed sentences. Accordingly, I.C. § 19–2719 does not violate the defendant's constitutional right to equal

protection, and the trial court correctly denied Beam's post conviction petition. *Beam*, 115 Idaho at 213, 766 P.2d at 683.

We have reviewed our analysis and holding in *Beam*, and reaffirm the principle established therein. Recently, in *State v. Rhoades (Baldwin)*, 120 Idaho 795, 820 P.2d 665 (1991), the Court held:

> Therefore we hold that I.C. § 19–2719 provides a defendant one opportunity to raise all challenges to the conviction and sentence in a petition for post-conviction relief except in those unusual cases where it can be demonstrated that the issues raised were not known and reasonably could not have been known within the time frame allowed by the statute. The legislature has seen fit to appropriately limit the time frame within which to bring challenges which are known or which reasonably should be known. The process encompassed in I.C. § 19–2719 providing for review by the trial court and then this Court, provides adequate opportunity to present the issues raised and to have them adequately reviewed. Therefore, I.C. § 19–2719 is not unconstitutional under due process analysis.

*Id.* at 807, 820 P.2d at 677.

Accordingly, we hold that I.C. § 19–2719 provides adequate opportunity to present the issues raised for review and is not unconstitutional under a due process analysis.

## IV.

As required by I.C.R. 33.1, a presentence investigator prepared a presentence report prior to the sentencing. In preparation of the report, the presentence investigator interviewed members of the Morey family and ultimately described their situation, including the placement and condition of the Moreys' minor children.[7] The presentence

---

7. The presentence report specifically states:
   VICTIM'S STATEMENT: The victims in this case are deceased. I interviewed members of Mrs. Morey's family. Her parents, Ada and Edward Stillwell, her brother, Roy Stillwell and a sister, Nancy Brown.
   They described their family as very closely knit. If someone needed help or moral support whether family member or stranger, Shirley and Eugene would lend a helping hand. They stated "they were poor but they would give what ever they had to help others. It has been very difficult to deal with the loss."
   They stated the two surviving children of the Morey couple, Terry, age 16 and Tammy age 13 are residing with an uncle, Clawrence Stillwell, and his wife in Rockland, Idaho, a small community near American Falls. The family, as a whole, decided on the placement with

investigation report also stated that it "was the consensus of the family that Card should be sentenced to death for his crime." Card argues that the comments regarding the family of the victims and the opinion of family members concerning a particular sentence was a violation of the constitutional doctrines enunciated in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299, *cert. denied,* 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989).

■ The victim impact statement issue as to the effect of the crime on the children and family members is resolved by a recent holding of the United States Supreme Court. *Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Left unresolved by *Payne,* however, is the issue of the family's feelings and comments concerning the sentence to be imposed. In *Payne,* the Supreme Court held that the Eighth Amendment erects no per se bar prohibiting a capital sentencing jury from considering "victim impact" evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family. In *Payne,* the Supreme Court partially overruled *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Likewise, to the extent that our holdings in *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); and *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989), *cert. denied,* 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989), are to the contrary on the issue of the impact of the crime on the family members they are overruled.

In *Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the

United States Supreme Court analyzed the victim impact issue and held:

We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth,* 482 U.S., at 517 [107 S.Ct. at 2540] (WHITE, J. dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers,* 490 U.S., at 821 [109 S.Ct. at 2216] (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

. . . .

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

Clawrence who could provide better financially for the children and also they felt a change of environment away from the constant reminders of their parents would be beneficial to them. They stated the children are both in counseling and seem to be adjusting to their environment and are doing well in school. It is the consensus of the family of the victims, Shirley and Eugene Morey, that the de-

fendant, Mr. Card, should be sentenced to death for his crime. It is their opinion that if he could shoot to death two total strangers with no provocation whatsoever, he could do it again just as easily.

Mrs. Ada Stillwell stated, "As a mother, my heart goes out to Mr. Card's mother. I know she is suffering her own grief and heartache for her son also."

111 S.Ct. at 2608–09.[8]

In the instant case the sentencing judge made the following remarks concerning the victim impact statements contained in the report:

I find it interesting, but an apparently factual part of the law in the State of Idaho today, and not only the State of Idaho but under Federal Court edict through the Federal system, that when something like this occurs, they take the position that the survivors or family members of the victim's family are not permitted to make statements or testify to the Court concerning the effect upon the family that this homicide has had.

They say that that would prejudice the judge or jury in those states where the jury is involved and cause that person or group of persons to make an irrational decision, to reach conclusions that would be based solely upon emotion rather than upon a review of the facts. However, it is perfectly appropriate for the perpetrator of the crime to have his family's support and members come forth and speak in his behalf. There is no prohibition against that. I find that strange myself, but that seems to be the state of the law.

There can be no spokesman here for Eugene and Shirley Morey. The silence is deafening where they are concerned. But I'm not supposed to be just totally retributive about my attitude. What I have to do is reach a decision whether these mitigating factors I find exist in this case outweigh any of them or collectively outweigh the aggravating factors that exist.

Unlike the victim impact statements in *Booth* and *Charboneau* which were detailed, the statements in this case briefly stated that although it has been difficult to deal with the loss, the two children had

been placed in the home of an uncle, appeared to be adjusting to their new environment and doing well in school. Such statements constituted feelings that one could assume loved ones would experience in the circumstances. *See State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991). In light of the Supreme Court's holding in *Payne v. Tennessee*, we hold that the victim impact statement as to the impact on family members contained in the presentence report was not improper and did not violate Card's constitutional rights.

Contained in the presentence report is a statement that the Morey family members felt that Card should receive the death penalty. Although the Supreme Court did not address this issue because no evidence was presented in that case, we do so because it is an issue before us. We have carefully reviewed the entire record and are satisfied beyond a reasonable doubt that the sentencing judge imposed the death penalty in this case based on the evidence and without regard to the opinions of the Morey family and the statements contained in the presentence investigation report regarding the nature of the sentence. *See Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1991); *Parker v. Dugger*, 537 So.2d 969 (Fla.1988); *People v. Jones*, 123 Ill.2d 387, 123 Ill.Dec. 944, 528 N.E.2d 648 (1988). We, therefore, hold that the victim impact statements contained in the presentence report, including the comments contained in the report as to an appropriate sentence, are not error and do not require that the case be remanded for resentencing.

It is clear from reading the record that the sentencing judge was aware of and knew the state of the law and that he did

8. The special concurring opinion of Justice O'Connor provides clarification and guidance for trial courts involved in capital sentencing:
    We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no

*per se* bar." *Ante,* [111 S.Ct.] at 2609. If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

not consider the statements made by the family members in imposing sentence.

## V.

Card argues that the "utter disregard for human life" language of I.C. § 19-2515(g)(6) is unconstitutionally vague.[9] Relying upon *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), in which the United States Supreme Court held that the mitigating circumstance of "outrageous or wantonly vile, horrible and inhuman" conduct allowed "standardless discretion" and the arbitrary and capricious infliction of the death penalty, Card argues that the "utter disregard" language of I.C. § 19-2515(g)(6) is similarly vague. Card also argues that because the trial court did not define its use of the term "utter disregard," its findings are insufficient to show that the imposition of death in this case is reasoned and objective.

■ Under the Eighth Amendment of the federal Constitution, a claim of vagueness is analyzed by determining whether the challenged aggravating circumstance adequately informs the sentencer what it must find in order to impose the death penalty, or whether it leaves the sentencer with unchanneled discretion to make an arbitrary and capricious decision. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991). Recently, the United States Supreme Court in *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), clarified the requirement for clearly defined aggravating circumstances. In *Lewis* the United States Supreme Court stated:

Our capital punishment doctrine is rooted in the principle that " '[t]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be ... wantonly and ... freakishly imposed.' " *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (joint opinion) (quoting *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 2762, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring)); see also *Furman, supra*, at 313, 92 S.Ct., at 2764 (White, J., concurring) (invalidating capital punishment statute where "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not"). Accordingly, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S., at 189, 96 S.Ct., at 2932.

This principle requires a State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey, supra*, 446 U.S., at 428, 100 S.Ct., at 1764 (footnotes omitted). A State's definitions of its aggravating circumstances—those circumstances that make a criminal defendant "eligible" for the death penalty—therefore play a significant role in channeling the sentencer's discretion....

....

We have reiterated the general principle that aggravating circumstances must be construed to permit the sentencer to make a principled distinction between

---

**9.** Subsequent to oral argument in the instant case, the United States Court of Appeals for the Ninth Circuit decided *Creech v. Arave*, 947 F.2d 873 as amended October 16, 1991 (Trott, Circuit Judge dissenting from order denying rehearing *en banc*, joined by Kozinski and T.G. Nelson), which addressed the "utter disregard for human

life" language of I.C. § 19-2515(g)(6), and held it to be unconstitutionally vague. We will address the applicability and effect of *Creech v. Arave* later in this decision following our review of the cases emanating from this Court and the United States Supreme Court.

those who deserve the death penalty and those who do not. See *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) ("[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder")

. . . .

110 S.Ct. at 3099–3100 (footnote omitted).

In *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court stated the manner in which a statute must be reviewed to determine its constitutionality.

> When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and if they have done so, whether those definitions are constitutionally sufficient, *i.e.,* whether they provide *some* guidance to the sentencer.

110 S.Ct. at 3057 (emphasis in original).

The United States Supreme Court in *Walton v. Arizona,* further stated, in terms of the language of the Arizona statute, that the "definition of an aggravating factor of this nature is not susceptible of mathematical precision," and that a statute will be constitutionally sufficient if it "gives meaningful guidance to the sentencer." 110 S.Ct. at 3058.

In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), we recognized that there was a "need for clear standards to guide the discretion of the sentencing body in death penalty cases" to conform with the guidelines of the United States Supreme Court's mandate outlined in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *State v. Osborn,* 102 Idaho at 417, 631 P.2d at 199. The clear standards were necessary to "channel the sentencing decision" so that a "pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* [*v. Georgia* ]" would not occur. Thus, "a limiting construction is indispensable if the state is to meet its constitutional obligation to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." In *State v. Osborn,* we held:

> Under *Gregg,* it is apparent that the language contained in I.C. §§ 19–2515(f)(5) and (6) [now I.C. §§ 19–2515(g)(5) and (6) ] is facially constitutional. However, inasmuch as a reasonable person could fairly characterize any murder as "especially heinous, atrocious or cruel, manifesting exceptional depravity" and as exhibiting an "utter disregard for human life," it is equally apparent under *Godfrey [v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ] that this court must place a limiting construction upon these statutory aggravating circumstances so as to avoid the possibility of their application in an unconstitutional manner.

102 Idaho at 417–18, 631 P.2d at 199–200.

Therefore, in *Osborn* we described the following limiting construction on the "utter disregard" language of I.C. § 19–2515(g)(6):

> To properly define this circumstance, it is important to note the other aggravating circumstances with which this provision overlaps. The second aggravating circumstance, I.C. § 19–2515(f)(2) [now I.C. § 19–2515(g)(2) ], that the defendant committed another murder at the time this murder was committed, obviously could show an utter disregard for human life, as could the third aggravating circum-

stance, I.C. § 19–2515(f)(3) [now I.C. § 19–2515(g)(3)], that the defendant knowingly created a great risk of death to many persons. The same can be said for the fourth aggravating circumstance, I.C. § 19–2515(f)(4) [now I.C. § 19–2515(g)(4)], that the murder was committed for remuneration. Since we will not presume that the legislative intent was to duplicate any already enumerated circumstance, thus making I.C. § 19–2515(f)(6) mere surplusage (See, e.g., *Norton v. Dept. of Employment,* 94 Idaho 924, 500 P.2d 825 (1972)), we hold that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in I.C. §§ 19–2515(f)(2), (3), and (4). *We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer.* With such an interpretation, it is our conclusion that this aggravating circumstance meets the constitutional requirements set forth by the United States Supreme Court.

102 Idaho at 418–19, 631 P.2d at 200–01 (emphasis added).

In *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989), we further distinguished the "utter disregard" language of I.C. § 19–2515(g)(6) from the "heinous, atrocious or cruel" language of I.C. § 19–2515(g)(5). We stated:

[T]he "utter disregard" factor refers not to the outrageousness of the acts constituting the murder, but to the defendant's lack of conscientious scruples against killing another human being.

. . . .

The particularly cold-blooded killer need not act sadistically or in a particularly outrageous fashion in order to commit a killing with utter disregard for human life. One who commits a crime in an especially heinous way is punished for the heinousness of his crime, not because he acted with utter disregard for human life, although it may be expected that most especially heinous, atrocious or cru-

el murders will have been committed with utter disregard for human life.

116 Idaho at 99, 774 P.2d at 269.

Since *Osborn,* we have reiterated our definition of "utter disregard for human life" and affirmed its constitutionality in other capital cases. *See State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989); *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989); *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986); *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (1985); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1984); and *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). In addition, the United States District Court for the District of Idaho has upheld on at least two occasions in reviewing a death penalty case on collateral review this Court's limiting definition of "utter disregard" as constitutionally sufficient. *See Fetterly v. Paskett,* 747 F.Supp. 594 (D.Idaho 1990); *Beam v. Paskett,* 744 F.Supp. 958 (D.Idaho 1990).

Recently, however, the United States Court of Appeals for the Ninth Circuit held that the "utter disregard" language of I.C. § 19–2515(g)(6) is unconstitutionally vague. *Creech v. Arave,* 947 F.2d 873, as amended October 16, 1991 (Trott, Circuit Judge dissenting from order denying rehearing *en banc,* joined by Kozinski and T.G. Nelson). In light of *Creech v. Arave,* we must look to the record to determine whether there is evidence to support the trial court's finding of the other aggravating circumstance.

It is presumed that when a trial judge considers the death penalty, he or she will apply the aggravating circumstances in such a manner to avoid the freakish and arbitrary application of the death penalty. *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Our review of the record satisfies us that the circumstances of this case are sufficiently aggravating to warrant imposition of the death penalty. It is clear from the record before us that the defendant killed two people he had never met. The acts and circumstances of this murder as

contained in the record confirm the trial court's finding that Card was a conscienceless, pitiless slayer who killed two innocent persons in cold blood without reason or provocation. The sentencing court stated:

One thing that stands out about this case, in my mind, is that it has been—I personally have been involved as a judge or a lawyer in a significant number of murder cases, and this is the first case with which I have had any contact in which there was not some type of a connection between the perpetrator and the victim. Now, in some of those cases, those connections may have arisen on the basis of human motives and from the most despicable of human qualities, but there was a basis. Maybe it was an irrational, unreasonable sexual drive of some kind that caused the defendant in a particular case to do the thing he did; maybe it was revenge; maybe it was a real or perceived threat of some kind. But in every case the person, or in this case the person killed, had some kind of a connection with the perpetrator.

In this case, there was none. The reason that Eugene and Shirley Morey are dead is because they just happened to be there. Whoever else might have been sitting at that place at that time would have suffered the same fate. There is not one shred, not one iota of evidence in any form of provocation, or in any form of retribution or revenge, real or imagined, as it relates to the Defendant and Eugene and Shirley Morey.

That makes the killing in this case unique in my own experience. So it almost belies human comprehension as to how this could occur with no provocation, absent total, literal insanity, as most of us non-psychiatrically trained people think of insanity. The interesting thing raised in this case is the contention of diminished mental capacity. It to me is the most significant mitigating factor that is raised here.

I find that by the evidence adduced at the trial of this case, as well as the evidence adduced here or discussed here, that beyond a reasonable doubt there are two aggravating factors involved in this

case, the first and most obvious being that in the commission of the murder a second murder was committed. That goes without saying.

I find also that because, at least in large part because of the lack of any provocation whatsoever, that by the murder and circumstances surrounding it, that the commission of this murder by the perpetrator exhibited utter and total disregard for human life. In my view, absent some excuse or justification, it was a cold-blooded, pitiless killing.

The evidence in this case as it relates to the Defendant, as argued by the State, indicates a walking-up to the car of these two people wrapping their newspapers, no announcements, no apparent statements, no nothing, just shooting each of them in the head and walking away, hesitating momentarily, walking back to the other side of the car and shooting them both again. It was an execution, in my judgment, of these people.

In addition to the trial court's finding that the defendant displayed "utter disregard for human life" pursuant to I.C. § 19–2515(g)(6), there was another aggravating circumstance present in this case. The evidence in the record of the instant case clearly shows that "another murder" was committed as contemplated by I.C. § 19–2515(g)(2). At the time Eugene Morey was murdered, Shirley Morey was also murdered. Therefore, without addressing whether the Ninth Circuit Court of Appeals is correct in its conclusion that the "utter disregard for human life" language in I.C. § 19–2515(g)(6) is unconstitutionally vague, we hold that the record before us supports the trial court's finding that at the time each of the respective victims were killed, "another murder" was committed as contemplated by I.C. § 19–2515(g)(2). That finding, having been weighed against the mitigating circumstances, is sufficient to sustain the trial court's consideration of the death penalty and it is not necessary that we address the constitutionality of I.C. § 19–2515(g)(6).

■ Our decision in *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989),

requires that the sentencing judge weigh the cumulative mitigating circumstances against each of the aggravating circumstances separately. Here, the sentencing judge found five mitigating circumstances: 1) the defendant suffers at least some mental illness or aberration; 2) the defendant has been a good and faithful employee and worker; 3) until the perpetration of the crimes of which he has been convicted, the defendant had no prior history of violent behavior; 4) the defendant has no record of prior felony convictions; and 5) while in pre-trial confinement at the Secured Medical Facility at the Idaho State Penitentiary the defendant responded positively to medical and psychiatric treatment. The sentencing judge followed *Charboneau* by finding that "all the mitigating circumstances do not outweigh the gravity of each of the aggravating circumstances found" and that the imposition of the death penalty was not unjust. *State v. Charboneau*, 116 Idaho at 153, 774 P.2d at 323. The sentencing judge stated: "I am not convinced that these mitigating factors collectively or individually outweigh either one of the aggravating factors." We have reviewed the record and find that the evidence supports the sentencing judge's findings in this regard. Furthermore, we find that the trial judge's written findings of fact were sufficiently detailed to insure that the death penalty was imposed in a reasonable and objective manner as is constitutionally required. Since the record is sufficient and the findings of the district

court are set forth with reasonable exactitude this Court has been able to fulfill the function of "meaningful appellate review" as required by the decisions of the United States Supreme Court and this Court. *State v. Osborn*, 102 Idaho 405, 415, 631 P.2d 187, 197 (1981).

VI.

We are required by I.C. § 19–2827(c) to independently review the sentence and determine 1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; 2) whether the evidence supports the judge's findings of a statutory aggravating circumstance; and 3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ We have reviewed the record of the sentencing hearing and find that the sentencing judge appropriately followed the mandate of I.C. § 19–2515. We hold that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the sentencing judge's finding of two statutory aggravating circumstances beyond a reasonable doubt. We have also reviewed this case and compared it with other first degree murder cases in which the death penalty was imposed[10] as well as those cases in

10. *State v. Rhoades (Baldwin)*, 120 Idaho 795, 820 P.2d 665, (1991); *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990); *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989); *McKinney v. State*, 115 Idaho 1125, 772 P.2d 1219 (1989); *State v. Fetterly*, 115 Idaho 231, 766 P.2d 701 (1988); *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied*, 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied*, 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986); *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985); *State v. Bainbridge*,

108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984); *State v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major*, 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336, *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Olin*, 103 Idaho 391, 648 P.2d 203 (1982); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981); *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979).

which the death penalty was not imposed.[11] From our review of these cases it does not appear that the sentence of death in this case is excessive or disproportionate.

In determining whether the sentence of death is proportional we compare the "gravity of the offense," which is understood to include not only the injury caused, but also the defendant's moral culpability with the "harshness of the penalty." *See Penry v. Lynaugh*, 492 U.S. 302, 343, 109 S.Ct. 2934, 2959, 106 L.Ed.2d 256, 294 (1989) (Brennan, J. concurring in part and dissenting in part) (*citing Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983)). It is clear that a mental defect may diminish an individual's culpability for a criminal act. *See Penry v. Lynaugh*, 109 S.Ct. at 2956. In Idaho a sentencing court is required to consider any claim of mental illness in sentencing and determine:

(a) The extent to which the defendant is mentally ill;

(b) The degree of illness or defect and level of functional impairment;

(c) The prognosis for improvement or rehabilitation;

(d) The availability of treatment and level of care required;

(e) Any risk of danger which the defendant may create for the public, if at large, or the absence of such risk;

(f) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law at the time of the offense charged.

I.C. § 19–2523(1).

In this case Card argued that his mental state was sufficiently severe that it should foreclose the possibility of the death penalty. The district court considered the mental condition of Card and stated:

> I am not convinced that there is enough certainty, enough reliability and psychiatric opinion to explain away what otherwise appears to be a well-thought-out, deliberately planned and intentional shooting and killing of two people—for those reasons, I am not convinced that these mitigating factors collectively or individually outweigh either one of the aggravating factors.

The district court further expressly stated that he understood the importance of considering the mental state of the defendant at the time of sentencing since I.C. § 18–207 absolved the insanity defense. The district court noted that the diminished capacity circumstance was the most significant mitigating factor but that it was not sufficient to outweigh either of the aggravating circumstances in this case. Thus, we are satisfied that the district court properly considered the mitigating circumstances and weighed those factors separately against each aggravating circumstance. After reviewing the record, we hold that Card's mental condition has been considered and that issue is insufficient to make the imposition of the death penalty in this case disproportionate. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[12]

The cases cited above are capital cases decided subsequent to the adoption of I.C. § 19–2827. In addition to the foregoing cases we also reviewed earlier capital cases in our proportionality analysis and find no disproportionality. *State v. Gerdau*, 96 Idaho 516, 531 P.2d 1161 (1975); *State v. Powers*, 96 Idaho 833, 537 P.2d 1369 (1975), *cert. denied*, 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974); *State v. Rodriguez*, 93 Idaho 286, 460 P.2d 711 (1969); *State v. Gonzales*, 92 Idaho 152, 438 P.2d 897 (1968); *State v. Koho*, 91 Idaho 450, 423 P.2d 1004 (1967); *State v. Clokey*, 83 Idaho 322, 364 P.2d 159 (1961); *State v. Snowden*, 79 Idaho 266, 313 P.2d 706 (1957); *State v. Owen*, 73 Idaho 394, 253 P.2d 203 (1953) (considered only in terms of crime committed and penalty imposed), *overruled* on substantive law point in *State v. Shepherd*, 94 Idaho 227, 486 P.2d 82 (1971).

11. *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991); *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990); *State v. Smith*, 117 Idaho 891, 792 P.2d 916 (1990).

12. In *Penry*, the United States Supreme Court indicated that the imposition of the death penalty on a twenty-two-year-old who had the mental age of a six-year-old convicted of a capital crime would not be prohibited per se by the eighth amendment.

## VII.

We have reviewed all of the issues raised by Card and have conducted our independent review of the record as required by I.C. § 19–2827. We find no reversible error and specifically uphold the validity of I.C. § 18–207 regarding the insanity defense as well as the existence of an aggravating circumstance pursuant to I.C. § 19–2515(g)(2). In light of *Payne v. Tennessee,* we hold that the victim impact statements contained in the presentence report were not error, and whereas the statements as to sentence were not considered by the district judge in imposing the death penalty, we find no reversible error. We hold that the provisions of I.C. § 19–2719 are constitutional and do not violate the defendant's due process rights. Accordingly, we affirm the convictions and death sentences for first degree murder.

The judgment entered and sentence imposed are affirmed. Upon issuance of the remittitur the district court shall set a new execution date. I.C. § 19–2719(11).

BAKES, C.J. concurs and McDEVITT, J. concurs specially.

McDEVITT, Justice, specially concurring.

### INSANITY DEFENSE

An in-depth review of the legal principle of *stare decisis* is necessary in discussing the abolition of the insanity defense. While *stare decisis* is one of the first principles discussed in most law schools, its meaning and application are not universally understood. Most courts, when discussing *stare decisis,* use the term as one of general knowledge without need of further explanation. This has caused confusion as to its true definition and function. It is appropriate to discuss the origins of this principle and its development in Idaho law.

*Black's Law Dictionary* defines *stare decisis,* "[t]o abide by, or adhere to, decided cases." *Black's Law Dictionary* 1406 (6th ed. 1991). The term is shortened from the legal maxim, *stare decisis, et non quieta movere,* which means to adhere to decided cases and not to disturb matters established. This rule is sometimes referred to as the doctrine of precedent or authority. The origins and early development of this doctrine are little-known. It is evident that this doctrine is an important component of the foundation our the judicial system. Without it, there would be no consistency in the law, as the law would change from day to day. This uncertainty in the law is what courts should seek to eliminate.

The doctrine developed in English common law and then was transported to the United States with our adoption of the common law. *Carroll v. Carroll's Lessee,* 57 U.S. 275, 16 How. 275, 14 L.Ed. 936 (1853). One the earliest English cases where the use of this doctrine is evident is *Spicer v. Spicer,* 79 Eng.Rep. 451, Cro.Jac. 527 (1620). This case involved an ejectment action. The court rendered judgment for the defendant and, the reporter relates that, "they said, that those things which have been so often adjudged, ought to rest in peace." *Id.* A more descriptive definition of this doctrine can scarcely be conceived.

In commenting on this doctrine in the mid-eighteenth century, Sir William Blackstone wrote:

> For it is an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, an not liable to waver [sic] with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments; he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.

1 W. Blackstone, Commentaries, *69. This rigid view of *stare decisis* continued in England in the 19th century. A good example of how constrained English judges

felt by this doctrine is found in *Regina v. Reed*, 6 Cox C.C. 284 (1953), where one judge stated:

> I certainly had differed from the view of this case which has been taken by Lord Campbell at a time when it was uncertain what the case of Spears' actually was, and treating this case as res nova. The book in which the opinions of the judges are written, and which is always in the custody of the Lord Chief Justice, was mislaid; and the case of John Spears was differently reported in the two editions of Leach, and also in East's Crown Law; and that case could not for a long time be found. However, since it has been found, I have satisfied myself, and I entertain no doubt upon it. I should have delivered my reasons at length; but it is unnecessary now to do so. The cases of Rex v. Abrahat and Tex v. Spears having been discovered, and having read that case with the explanation of Heath, J., I find the point decided; and though, therefore, if this were res nova, I should have pronounced an opinion that this was not larceny, yet as that case is a decided authority, by the authority of that case I am bound; and it is unnecessary for me to deliver my reasons at any greater length.

*Id.* at 292.

Another example of this rigid view, is *Beamish v. Beamish*, 11 Eng.Rep. 735, 9 H.L.C. 275 (1861), the court wrote extensively as to what it felt was the proper resolution of the case, but felt the court was required to follow a previous ruling to the contrary. This view persisted at least into the mid-twentieth century. *See, Note,* Constitutional Stare Decisis, 103 Harv. L.Rev. 1344 (1990).

As this law developed in the United States, it underwent a significant change. James Kent ("Kent"), commenting on American law in the mid-nineteenth century, defined *stare decisis* as follows:

> A solemn decision upon a point of law, arising in any given case, becomes an authority in a like case, because it is the highest evidence which we can have of the law applicable to the subject, an the

judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was misunderstood or misapplied in that particular case. If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness; and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it.

1 J. Kent, Commentaries *475–76.

As this doctrine developed American courts departed from the rigid English view and adopted a more flexible view of this doctrine. American courts then became more willing to overrule precedent when necessary.

This is not to say courts did not feel constrained by *stare decisis* to follow precedent. Courts followed precedent where the line of authority was "clearly defined." *Townsend v. Jemison*, 50 U.S. (9 How.) 407, 414, 13 L.Ed. 194 (1850). Courts followed the view that:

> The doctrine of stare decisis is grounded on public policy and, as such, is entitled to great weight and must be adhered to, unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so....
>
> ...
>
> So, where the court has decided a question of law in another case and a like state of facts is subsequently presented, the rule of stare decisis applies and will not be easily changed.

*Muller v. Nebraska Methodist Hosp.*, 160 Neb. 279, 282, 70 N.W.2d 86, 88 (1955). This has been the view that this Court adopted. *See, Scott v. Gossett*, 66 Idaho 329, 158 P.2d 804 (1945).

It must also be noted that *stare decisis* has been extensively criticized. It has been said that *stare decisis* is a "wholesome doctrine" but that it is "not of universal application." *Vail v. Arizona*, 207 U.S. 201, 205, 28 S.Ct. 107, 108, 52 L.Ed. 169 (1907). Other commentators have stated that it must eventually be discarded. *See,*

E.B. Whitney, *The Doctrine of Stare Decisis*, 3 Mich.L.Rev. 89 (1904). It has also been urged that *stare decisis* should be more loosely applied in constitutional cases. This Court has stated that "[d]ecisions construing the Constitution should be followed, in the absence of cogent reasons to the contrary, as it is of utmost importance that our organic law be of certain meaning and fixed in interpretation." *Scott v. Gossett*, 66 Idaho 329, 335, 158 P.2d 804, 807 (1945). Whether it involve constitutional issues or property and contract issues, the standard for apply *stare decisis* should be the same. I recognize that *stare decisis* has been applied much more strictly to property and contract issues because of the belief that it is more likely people have changed their position in reliance on the law and the monetary considerations warrant adherence to existing law. *Bethke v. Idaho Sav. & Loan Association*, 93 Idaho 410, 462 P.2d 503 (1969). Although members of the general public do not change their position drastically based upon our interpretation of the constitution, I feel that *stare decisis* should be applied in constitutional arenas, as an individual's rights are much more important than mere monetary considerations.

*Stare decisis* is an important and fundamental component of our modern-day jurisprudence. It applies to every decision that we make. Kent stated the reason for the doctrine:

> It would therefore be extremely inconvenient to the public, if precedents were not duly regarded and implicitly followed. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them; and people in general can venture with confidence to buy and trust, and to deal with one another. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great landmarks of property. When a rule has been once deliberately adopted and declared, it ought not to be disturbed ... except for very cogent reasons, and upon a clear manifestation of error; and if the practice were otherwise, it would be leav-

ing us in a state of perplexing uncertainty as to the law.

1 J. Kent, Commentaries *476. So strong is the need to adhere to precedents that the commentator Sir William Jones wrote:

> No man, who is not a lawyer, would ever know how to act; and no man who is a lawyer, would, in many instances, know what to advise, unless courts were bound by authority as firmly as the Pagan deities were supposed to be bound by the decrees of fate.

W. Jones, Essay on Bailment. One court has stated that "[t]he certainty of the rule is often more important than the reason of it...." *White v. Denman*, 1 Ohio St. 110, 115 (1853). This certainty allows people to conduct and plan their lives without fear of constant change. Indeed, "[t]here are some questions of law, the final settlement of which is vastly more important than how they are settled." *Haskett v. Maxey*, 134 Ind. 182, 33 N.E. 358 (1893). Overruling precedent "introduces an element of uncertainty into the administration of justice from which the public suffer great inconvenience." *Id.* The "stability in the decisions of a court of last resort is greatly to be desired." *Id.* I find that:

> [w]hen the law is plainly or intelligibly written, or expounded and settled by competent judicial authority, and not repugnant to fundamental law, I always yield a willing obedience to the maxims, *ita lex scripta*, and *stare decisis*, without the observance of which the law is divested of one of its most important attributes, becomes fluctuating and capricious, and instead of being a steady light to guide, or shield to protect, becomes an *ignis fatuus* to mislead, or a snare to entrap the citizen. All general rules of law must, in their operation, be productive of hardship and injustice in particular and individual cases. By making every case of hardship an exception, we virtually abrogate the rule itself, and make hard cases what they have been not appropriately termed, "the quicksands of the law." Of necessity, we have to choose between two alternatives, that of the partial evil or inconvenience of a rigid adherence to the law or general

rules, or the general, nay, universal evil or inconvenience of no rule, no law but the wild discretion of the judge. Bain and abortive have been, and must ever be, the attempts to prevent or remedy all injustice by undertaking the task of essaying to do perfect justice in every case upon its own peculiar principles and circumstances, regardless of general rules. *Perkins v. Clements,* 1 Pat. & H. 141, 153–54 (Va.1855).

This is not to say that a precedent should never be overruled, but that courts should follow their precedents except when a precedent is manifestly wrong. *Stare decisis* cannot be disregarded and used only when it is convenient.

As *stare decisis* evolved in Idaho, it is clear that this rule does not mandate unyielding acquiescence to prior decisions. *"Stare decisis* is not a confining phenomenon but rather a principle of law." *Smith v. State,* 93 Idaho 795, 801, 473 P.2d 937, 943 (1970). "The rule, *to stand by decided cases, and to maintain former adjudications,* contemplates more than blindly following some former adjudication, manifestly wrong. If it were to be applied strictly, no former decision would ever be overruled." *Higer v. Hansen,* 67 Idaho 45, 64, 170 P.2d 411, 423 (1946) (emphasis in original). Accordingly, we recognize that this rule, "though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court ..." *Hertz v. Woodman,* 218 U.S. 205, 212, 30 S.Ct. 621, 622, 54 L.Ed. 1001 (1910). Indeed, "when the application of this principle will not result in justice, it is evident that the doctrine is not properly applicable."˙ *Smith v. State,* 93 Idaho 795, 801, 473 P.2d 937, 943 (1970). Sometimes a court must adhere to prior unsatisfactory rules to avoid the difficult and burdensome results occurring after a change after a long period of accommodation. *Helvering v. Griffiths,* 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (1943); *Davis v. Department of Labor* 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942); *Missouri v. Ross,* 299 U.S. 72, 57 S.Ct. 60, 81 L.Ed. 46 (1936).

While we must adhere to our previous decisions, *stare decisis* does require us to reexamine our prior precedents to determine whether they are still valid. This court has stated:

This Court in the proper performance of its judicial function is required to examine its prior precedents. When precedent is examined in the light of modern reality and it is evident that the reason for the precedent no longer exists, the abandonment of the precedent is not a destruction of stare decisis but rather a fulfillment of its proper function.

*Smith v. State,* 93 Idaho 795, 801, 473 P.2d 937, 943 (1970); *accord Dogget v. Boiler Engineering & Supply Co.,* 93 Idaho 888, 477 P.2d 511 (1970). While it may seem *stare decisis* is a rule of convenience, it is not. I believe this rule requires us to stand by our prior decisions unless there are compelling and cogent reasons that necessitate a departure from our previous rulings.[13]

Addressing the issue at hand, I would still urge today, as I did in *State v. Searcy,*

---

13. In *Bethke v. Idaho Sav. & Loan Association,* 93 Idaho 410, 462 P.2d 503 (1969), we enunciated the following guidelines in determining whether to follow the rule of *stare decisis:*

1. *In furtherance of private ordering—*
(a) The desirability of enabling people to plan their affairs at the stage of primary private activity with the maximum attainable confidence that if they comply with the law as it has theretofore been announced, or can fairly be expected to be announced thereafter, they will not become entangled in litigation.
(b) The desirability of providing private counsel so far as possible with stable bases of reasoning....
(c) The desirability of encouraging the remedial processes of private settlement by minimizing the incentives of the parties to try to secure from a different judge a different decision than has been given by the same or other judges in the past.

2. *In furtherance of fair and efficient adjudication—*
(a) The desirability, from the point of view of the litigants, of expediting litigation and minimizing its costs by sparing them the necessity of relitigating every relevant proposition in every case.
(b) The need, from the point of view of the judicial system, of facilitating the dispatch of business—indeed, the sheer impossibility of reexamining *de novo* every relevant proposition in every case.

118 Idaho 632, 798 P.2d 914 (1990), that the abolition of the insanity defense is unconstitutional. But when I consider my views in conjunction with the policies behind *stare decisis*, my personal views must give way, it is therefore necessary to follow the law as enunciated in *Searcy.*

In applying the guidelines articulated in *Bethke,* I can find no cogent reasons for continuing to dissent. I feel the need to provide a stable basis of law by which legal counsel and their clients may plan their affairs. Litigants need to be assured that the law will remain substantially the same day-to-day in order to avoid relitigating every point of every case. It is necessary to respect the opinions of this Court, even when I find myself in the minority. As Lord Brougham stated, "I may lament the unsatisfactory state of our law, ... But I am here only to declare the law." *Lynch v. Knight,* 11 Eng.Rep. 854, 861, 9 H.L.C. 577, 592 (1861). It having been determined that the abolition of the insanity defense is constitutional, I will follow the law as stated in *State v. Searcy* and concur in Part II.

### LIMITATION FOR POST–CONVICTION RELIEF

The appellant argues that the expedited post-conviction proceedings of I.C. § 19–2719 are unconstitutional. This statute was previously held to be constitutional in *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); and, *State v. Rhoades,* 120 Idaho 795, 820 P.2d 665 (1991). The appellant's argument is without merit.

The appellant attempts to attack this statute by suggesting the hypothetical scenario of a defendant who wishes to claim his trial counsel was ineffective. The appellant urges that because a defendant must bring the ineffective assistance of counsel claim in a post-conviction proceeding, and that the trial counsel is responsible for the direct appeal from the conviction, the defendant must then represent himself in a *pro se* post-conviction petition which will be consolidated with the direct appeal, which would still be handled by the trial counsel who is alleged to be incompetent. This argument must be rejected.

It is clear that a defendant who claims ineffective assistance of counsel must do so through a petition for post-conviction relief.[14] Idaho Code § 19–2719(3) requires a defendant to "file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known."

### VICTIM IMPACT STATEMENT

I cannot agree with the opinion's analysis of *Payne v. Tennessee,* —— U.S. ——, 111

(c) The need of discouraging a rush of litigation whenever there is a change of personnel on the bench.
(d) The desirability, from the point of view of fairness to the litigants, of securing a reasonable uniformity of decision throughout the judicial system, both at any given time and *from one time to another.*
(e) The desirability of promoting genuine impersonality of decision by minimizing the elements of personal discretion, and of facilitating the operation of the check of professional criticism.
(f) The propriety of according respect to the conclusions of predecessor judges.
(g) The injustice of disappointing expectations fairly generated at the stage of primary private activity.
3. *In furtherance of public confidence in the judiciary—*
(a) The desirability of maximizing the acceptability of decisions, and the importance to this end of popular and professional confidence in (1) the impersonality of decisions and (2) their reasoned foundation, as mani-

fested both by the respect accorded to them by successor judges and by their staying power.
(b) The necessity, considering the amorphous nature of the limits upon judicial power and the usual absence of an effective political check at the ballot box, that judges be subject to the discipline and the restraint of an obligation to build upon the prior law in a fashion which can withstand the test of professional criticism."
*Id.,* 93 Idaho at 412–13, 462 P.2d at 505–06 (quoting from H.M. Hart, Jr. and A.M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law,* 587–88 (Cambridge, Mass., tentative ed. 1958)).

14. *In re Cordero,* 46 Cal.3d 161, 249 Cal.Rptr. 342, 756 P.2d 1370 (1988) (habeas corpus); *People v. Bean,* 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996 (1988) (habeas corpus); *Bundy v. Deland,* 763 P.2d 803 (Utah 1988), *Daniels v. State,* 100 Nev. 579, 688 P.2d 315 (1984); *Sims v. State,* 295 N.W.2d 420 (Iowa 1980); *Commonwealth v. Russell,* 477 Pa. 147, 383 A.2d 866 (1978).

S.Ct. 2597, 115 L.Ed.2d 720 (1991). Nor will I overrule, even in part, *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), or *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990).

*Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), identified two types of information contained in victim impact statements. The first (Type I) describes "the personal characteristics of the victims and the emotional impact on the family" and the second (Type II) reports "the family members' opinions and characterizations of the crimes and the defendant." *Booth*, 482 U.S. at 502, 107 S.Ct. at 2533. *Payne* only overruled *Booth* and *Gathers* as to the Type I information. Type II information is still prohibited under the U.S. Constitution by *Booth* and *Gathers*. Therefore, it will be necessary to discuss each type of information separately.

*Type I Information*

My reading of *Payne* does not indicate that it stands for the proposition that victim impact statements pose no constitutional problems, whatsoever. Justice O'Connor's concurring opinion is especially enlightening on this subject where she states:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no per se bar." Ante, at 2609. If, in a particular case, a witness' testimony of a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

*Payne*, 111 S.Ct. at 2612. After making this statement, Justice O'Connor then proceeds to perform a Fourteenth Amendment balancing test concerning the victim impact evidence. Therefore, it is abundantly clear that while Type I victim impact evidence does not pose any Eighth Amendment violation, it still poses other constitutional considerations.

Due process is not a technical concept, it is flexible as the situation demands. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). It is firmly established that due process requires notice and a meaningful opportunity to be heard. *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). The Due Process Clause of the Fourteenth Amendment also protects against arbitrary and capricious acts of the government. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Due process requires that judicial proceedings be "fundamentally fair." *Lassiter v. Department of Soc. Serv. of Durham Cty.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 2163, 68 L.Ed.2d 640 (1981). To meet this requirement of fundamental fairness, a sentence of death must be imposed based upon reason, not on impulse or emotion. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1978).

The Type I information contained in the victim impact statement consisted of information that had already been produced at trial. This information about the victims, the children and other family members were facts already known to the judge. The statement that "It has been very difficult to deal with the loss.", is indicative of any family struggling with the murder of a loved one. I cannot see how any of this information adversely affected the sentencing process. There was no error.

*Type II Information*

The victim impact statement in this case also contained Type II information. The offensive testimony comes from the statement that:

> It is the consensus of the family of the victims, Shirley and Eugene Morey, that the defendant, Mr. Card, should be sentenced to death for his crime. It is their opinion that if he could shoot to death two total strangers with no provocation whatsoever, he could do it again just as easily.

Because this information is unconstitutional pursuant to *State v. Charboneau*, 116

Idaho 129, 774 P.2d 299 (1989), *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), we must determine whether this information prejudiced the defendant. This failure to strictly adhere to procedure does not require automatic reversal if we determine that this error was harmless. *State v. Paz*, 118 Idaho at 556, 798 P.2d at 15. Therefore, we review the record to determine whether the information "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

When I balance this statement against the evidence adduced at trial, I cannot say that the victim impact statement unfairly prejudiced the appellant. Not only was the trial court already aware of the fact that the appellant shot the Moreys without warning or provocation, the trial court had also heard extensive medical testimony concerning the appellant's mental condition. In response to the victim impact information, the trial court pointed out that it was aware that it was unable to consider this information and that the sentence to be imposed was to be determined solely by weighing the mitigating factors against each aggravating factor. It is apparent that the court imposed the sentence of death by an exercise of reason and not arbitrarily or capriciously, therefore the error was harmless pursuant to *State v. Paz*.

## AGGRAVATING AND MITIGATING FACTORS

### A. *Utter Disregard for Human Life*

The appellant challenges the "utter disregard for human life" language of I.C. § 19–2515(g)(6). We have previously defined this language in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), as "reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer. We reaffirmed the constitutionality of this language and added further to the definition in *State v. Fain*, 116 Idaho 82, 774 P.2d 252

(1989). In *Fain* we stated that this language does not refer to the outrageousness of the conduct, but the defendant's lack of conscientious scruples in killing another human being. We have then consistently upheld the constitutionality of this provision. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991); *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989).

In reviewing the application of this provision to the facts in this case, it is evident that no constitutional violation occurred. The appellant killed the Moreys without provocation and without any thought of their value as human beings. The appellant killed them simply because they were there. The circumstances surrounding this crime support the trial court's finding of "utter disregard for human life."

### B. *Other Aggravating Circumstances*

The appellant's argument completely fails to acknowledge the presence of another aggravating factor, that being I.C. § 19–2515(g)(2). The trial court found "At the time the murder was committed the defendant also committed another murder." This finding is supported by record.

It is also apparent that the trial court correctly weighed each and all mitigating factors together against each aggravating factor separately and found that the factors in mitigation did not outweigh either aggravating factor. The finding that when the appellant committed the murder that he also committed another murder by itself will support the sentence of death.

## PROPORTIONALITY

Idaho Code § 19–2827(c)(3) requires this Court to determine in each capital case, "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Our perusal of the legislative history regarding the proportionality of sentences does not offer much guidance. The Statement of Purpose and the committee minutes for the bill that was eventually passed

and codified as I.C. § 19–2827 expressed only a concern that the Idaho statute be updated to reflect recent rulings by the United States Supreme Court:

### STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme Court made new "rules" concerning imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Sections 18–4003 and 18–4004, *Idaho Code.* Then, last year, the United States Supreme Court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed. The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions on capital punishment so that we will conform with this latest expression of the law.

There is no mention of proportionality, or any expression by the legislature that we are required to review the proportionality of sentences with a special standard or test. The requirement that the death sentence not be disproportionate to "the penalty imposed in similar cases," is one of several considerations this Court must examine in each death penalty case. The legislature did not see fit to establish a separate standard for proportionality review of sentences when I.C. § 19–2827 was enacted.

This Court looked at the proportionality of death sentences in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), and reviewed several cases in which the death penalty had been imposed or could have been imposed. This Court compared the facts of these crimes with the facts of the case they were reviewing to determine whether or not the sentence was disproportionate.

In considering this crime and this defendant, compared to similar crimes and similar defendants,[15] the record in this case and the district court's findings and conclusions in imposing the sentence, we hold that the death sentence is not excessive or disproportionate. Therefore, I concur in the result finding that the appellant's sentence is proportional to other cases where the death penalty was imposed and where it was not imposed.

I would affirm the conviction and sentence of death imposed upon the appellant.

**15.** *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991); *State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991); *State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Smith,* 117 Idaho 891, 792 P.2d 916 (1990); *State v. Lankford,* 116 Idaho 860, 781 P.2d 197, *stay granted,* 490 U.S. 1061, 109 S.Ct. 2058, 104 L.Ed.2d 623 (1989); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989); *McKinney v. State,* 115 Idaho 1125, 772 P.2d 1219 (1989); *State v. Fetterly,* 115 Idaho 231, 766 P.2d 701 (1988); *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied,* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986); *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied,* 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985); *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v.*

*McKinney,* 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, *cert. denied,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979).

JOHNSON, Justice, concurring and dissenting.

I concur in parts I, II, III, IV, and V of the Court's opinion.

I respectfully dissent from part VI (Proportionality) of the Court's opinion. After making the review we are required to make pursuant to I.C. § 19–2827(c)(3), I conclude that the death sentence imposed in this case is excessive and disproportionate to the penalty imposed in similar cases, considering the circumstances of the defendant.

The legislature has directed us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827(c)(3). This provision was copied from the death sentencing scheme enacted in Georgia following the decision of the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Ga.Code Ann. § 17–10–35(c)(3) (1982).

In *Pulley v. Harris*, 465 U.S. 37, 42–43, 104 S.Ct. 871, 875–76, 79 L.Ed.2d 29, 35–36 (1984), the Supreme Court differentiated between traditional proportionality and the proportionality to which I.C. § 19–2827(c)(3) refers:

> Traditionally, "proportionality" has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. The death penalty is not in all cases a disproportionate penalty in this sense.
>
> The proportionality review sought by Harris, required by the Court of Appeals, and provided for in numerous state statutes is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

(Citations omitted).

In *Pulley*, the Supreme Court ruled that the statutory proportionality review mandated by statutes such as I.C. § 19–2827(c)(3) is not required by the eighth amendment. *Id.* In *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262, 288 (1987), the Supreme Court reaffirmed that this statutory proportionality review is not constitutionally required "where the statutory procedures adequately channel the sentencer's discretion."

Recently, the United States District Court for the District of Idaho noted that proportionality review is not constitutionally required but that *Pulley* and *McCleskey* "make clear that proportionality review *may* be considered and implemented by the states as an additional safeguard against arbitrarily imposed death sentences." *Beam v. Paskett*, 744 F.Supp. 958, 960 (D.Idaho 1990).

Therefore, I conclude that the review required by I.C. § 19–2927(c)(3) is entirely governed by the statutory intent of the legislature and not by any constitutional considerations. This statutory intent is revealed by the other provisions of I.C. § 19–2827 and by decisions of this Court applying the statute.

I.C. § 19–2827(g) provides that the Court "shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975." In *State v. Creech*, 105 Idaho 362, 375 n. 2, 670 P.2d 463, 476 n. 2 (1983), the Court read I.C. § 19–2827(c)(3) and (g) together "as requiring a comparison of the capital cases from 1975 to the present."

I.C. § 19–2827(a) provides that this Court must review a death penalty sentence "on the record." In *State v. Scroggins*, 110 Idaho 380, 387, 716 P.2d 1152, 1159 (1985), the Court construed I.C. § 19–2827(a) and (c)(3) together to require "an independent

review of the sentence on the record." In *Scroggins*, the Court concluded that the sentence of death imposed in that case was "excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." 110 Idaho at 387, 716 P.2d at 1159. The Court said:

We have painstakingly considered the record, and in so doing, have focused not only on the crime and the circumstances surrounding its commission but on the age, characteristics, criminal record and personal involvement of *this* defendant. We must conclude that the death sentence should not have been imposed in this case because in light of the following considerations, the death sentence as applied to this defendant was excessive.

*Id.* (emphasis in original).

Among the considerations discussed by the Court in *Scroggins* were that Scroggins did not have a history of violent criminal conduct, that his mental age was only 13.8 years, that he was under tremendous psychological pressure, and that he had failed to develop mature responses to stressful situations. 110 Idaho at 388, 716 P.2d at 1160.

In *State v. Windsor*, 110 Idaho 410, 420–22, 716 P.2d 1182, 1192–94 (1985), the Court said:

Whenever the death penalty is imposed this Court is required to conduct an independent review of the record to insure ... that when both the crime and the defendant are considered, a sentence of death is not excessive or disproportionate. After careful consideration of both the crime and the defendant, we conclude that the sentence of death imposed in this case was excessive and disproportionate. We therefore set aside the death sentence and remand for resentencing.

. . . .

The concept of individualized sentencing is firmly entrenched in modern American jurisprudence. The familiar maxim that punishment should fit the crime has been broadened to provide that punishment should also fit the criminal. With this in mind, we now turn our focus to the defendant as an individual, outlining those factors in Windsor's background and character which convince us that the death penalty was excessive in this instance. We begin by noting that Windsor, unlike the majority of capital defendants, has no formal criminal record nor significant history of prior criminal activity. There is no history of violent criminal activity, nor is there an indication that Windsor possesses any propensity toward violence.

The Court then reviewed other circumstances of Windsor personally, including her skills and abilities, her education, her experience and training, her troubled childhood and serious problems in her home environment. 110 Idaho at 422–23, 716 P.2d at 1194–95.

In this case, Card murdered the Moreys without any provocation and apparently without having had any prior acquaintance with them. The record does not disclose that Card had any motive to kill the Moreys. The murders were senseless and irrational.

Prior to the killings, Card had an argument with a clerk in a convenience store adjacent to where the shootings occurred. Card arrived at the store at about 1:30 a.m. The clerk described the conversation with Card before he left the store:

Well, he purchased milk and a sandwich and pickle and stuff and then he plopped himself up on the counter where the employees have their cigarettes or breaks whenever—when there is no customers or something, and just made himself at home, opened up everything up there and started talking to me about death and things like that.

. . . .

He just told me I was going to see somebody die, asked me if I had ever seen somebody die and said it was a gross sight or disgusting—I don't remember his exact terms, but he basically just [said], "Honey, have you ever seen anybody die? What time do you get off work?" I told him I just started my shift. He kept asking me and told me,

"Well, Honey, you can tell me what time you get off work." "Honey," "sweetheart" seemed like his favorite words and "death" and I was going to sit here and watch it.

He asked me if anybody else was on duty at that time and I told him yes. He asked where she was, I said she was in the cooler. He said—customers came in and he said "Hey, man, I know you" and the lady said, "I have never seen you before in my life," I told him—he was starting to get a little irate. I told him he was going to have to leave the store, he told me I could do nothing to him. I told him, "You will have to leave the store," and he got very mad at me. But he did leave the store after I told him he had to leave.

The clerk testified that after Card left the store he walked down the street toward the freeway.

At about 3:20 a.m. the same morning, another clerk in the same convenience store observed Card shoot three times into the driver's side of the Morey's automobile, then walk around to the passenger side and fire two more shots. Two other witnesses testified at trial that they also observed this sequence of events.

At trial, a witness testified that he had been incarcerated with Card following Card's arrest. The witness related what Card told him about the murders:

[H]e told me about the night he went out drinking and he went to three bars and in those three bars he didn't have a very good time. He went back to buy a sandwich or something at the [convenience store]. When he went to the [convenience store], he was going up to the cash register to pay for his purchase ... he picked up the girl who works there's milk and drank some of it and the girl got irate that he had drank from her carton and I guess chastised him pretty well for doing it. So he paid for his purchase and he told the girl he planned on killing someone, and in his own mind he said he was going to come back and kill her. So I guess he ate his sandwich and left.

... Well, he went up to the apartment and got his gun and he went back with the thought of killing this girl for having the audacity to chastise him over some milk, and when he got back—or he went and got some cigarettes first. I guess he walked the railroad tracks and at the end of the railroad tracks there's another store ... and ... he bought some cigarettes and he ran into a neighbor of his and the neighbor offered to give him a ride home.

At this point he was going to go ahead and take the ride because he had his cigarettes and then at that point he thought, "To hell with it, I'm going to go ahead and finish this job." So he walked ... over to the [convenience store]. Apparently the girl had gotten off of duty, she wasn't there. So he was ... mad because of the bars and he had gone to a restaurant and the people at the restaurant told him he couldn't come in there because he had been in there and been obnoxious a few nights before so they wouldn't allow him to have breakfast, and plus this girl. So he just went over and first he shot the man ... he shot the man through the glass and then reached in and shot him a couple of more times. Then he walked around behind the car and I guess the woman was getting out and he opened the door and just blasted her.

Then from what I understand he walked across the street and I guess there's a parking lot and a park and he just walked up there and went home.

The police report indicates that both the Moreys suffered bullet wounds to the head and that it appeared they had been shot through the closed windows of their vehicle. All indications were that the Moreys were folding newspapers prior to delivering them.

At the time of these murders, Card was twenty-eight years old. He had never been married, had no children, and was living with his mother and step-father. Although he did not graduate from high school, he did obtain his GED. He had a history of periodic employment as a janitor, ranch

hand and general laborer during the nine years prior to the murders. He had been convicted of reckless driving and three charges of driving while under the influence. He had no other criminal record.

Card started having a problem with drugs, specifically marijuana and alcohol, in high school. When he was about seventeen, he began to spend more time by himself, he withdrew from his friends, and he started acting more isolated and alone. When he was about twenty-one, he started talking about hearing voices and acting as though he were scared. He spent some time talking to himself when he was sitting around. He expressed the feeling that the television was also talking to him.

In 1984, Card told his mother and stepfather that he needed to be castrated because he was concerned that he was going to be made to travel in space and do things to women he didn't want to do. He talked about leaving his body. Within three or four months before the murders he talked to members of his family about a spiritual friend who was his son. He said this son was conceived when he impregnated a woman through space.

In November 1985, Card was admitted to a psychiatric facility. His evaluation at that time reflected the presence of a psychotic disorder. The doctor diagnosed Card's condition as schizophrenic and paranoid and recommended treatment. Card rejected the treatment.

Following Card's arrest for the murders, Dr. Estess and Dr. Webb determined that he was mentally incompetent to stand trial because of his mental status. During Card's treatment for this incompetency, a psychologist employed by the board of corrections diagnosed him as being mentally ill with schizophrenia. The psychologist described this illness as follows:

Well, it takes many forms, but generally the things you look for is some kind of loss of reality, some sort of specific symptoms of delusions, hallucinations, generally private, strange sorts of thought, some kind of persecution or some kind of omnipotence or some kind of unusual powers or something along those lines.

After approximately six months of treatment and medication, Card was declared competent to stand trial.

At trial, Dr. Estess testified:

Q With the information that you obtained and your evaluation of David in June, I guess, July, August on through probably February, were you able to or do you feel that you could come to an opinion as to his ability in early June to deliberate. That is to form a course of action as a result of careful thought and weighing the considerations for and against the proposed course of action?

A Yes, I have an opinion about that. I think I could, reasonably.

Q Could your express your opinion and explain it, please.

A It would be my opinion that his ability to do that or to reason was impaired and that he would not be able to do that, so I think that his capacity to reasonably deliberate and think and those kinds of things about even the consequences of this actions were significantly impaired. I don't think he had the ability to do that, based on the information which I have and which I have reviewed.

Q Is that as a result of his mental illness?

A I think that is as a result of his mental illness, yes.

At the time of the sentencing hearing, Dr. Estess reaffirmed the opinion he gave at trial and added:

It was generally my perspective that despite David's paranoid ideas and his psychotic state, which I think has gone on for some years, that he had been sort of able to work around it. And the position that I took prior to this trial ... was that it was my opinion that but for David's intoxication, in many ways I'm not sure this would have occurred. I think that his intoxication allowed him to slide further than he might have if he had not been intoxicated. That is purely conjecture on my part, but it was my

view that intoxication was a significant variable with respect to David's going ahead and making the decision to overtly express anger in the way that he did, and as inappropriately as he did.

As directed by I.C. § 19–2827(c)(3) and the decisions of this Court interpreting it, I have reviewed the sentence of death imposed on Card compared to the penalty imposed in similar cases in which the sentence was imposed in 1975 or later, considering both the crime and the defendant, to determine whether Card's sentence is excessive or disproportionate. For ease of reference, I append a summary of the cases I have compared.

The cases I find most similar to this one so far as the crime is concerned are:

1. *State v. Paz* (death penalty imposed).
2. *State v. Charboneau* (death penalty imposed).
3. *State v. Osborn* (death penalty imposed).
4. *State v. Lindquist* (death penalty imposed).

On the basis of this comparison of these cases in which the crime was similar to the murders in this case, I find the death sentence imposed on Card not to be excessive or disproportionate.

The cases I find most similar to this one so far as the defendant is concerned are:

1. *State v. Enno* (fixed life imposed).
2. *State v. Searcy* (fixed life imposed).
3. *State v. Scroggins* (death sentence vacated by Supreme Court as excessive and disproportionate).
4. *State v. Bainbridge* (fixed life imposed).
5. *State v. Olin* (sentence not stated, but presumably not the death penalty).

Except for the death penalty in *State v. Scroggins*, where this Court vacated the death sentence, the district judge imposed a life sentence in each of these cases. This comparison convinces me that Card's sentence was excessive and disproportionate.

My conclusion is not intended as criticism of the decision of the district judge to impose the death penalty. In my view, the legislature has directed this Court, pursuant to I.C. § 19–2827(c)(3), to review a death sentence in a different manner than the scheme the trial court is required to follow, pursuant to I.C. § 19–2515, in imposing sentence. The trial court's job is to determine if there are any statutory aggravating factors and, if so, whether the mitigating factors outweigh each of the aggravating factors. Our job is to determine on appeal from the imposition of the death penalty whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

**APPENDIX TO *CARD* OPINION OF JOHNSON, J.**

| CASE NAME & CITATION | CHARACTERISTICS OF DEFENDANT | CIRCUMSTANCES OF MURDER | CONVICTION AND SENTENCE BY TRIAL COURT | DISPOSITION BY IDAHO SUPREME COURT |
|---|---|---|---|---|
| *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991). | Eighteen-year-old male, suffered to a moderate degree from an anti-social personality disorder, severe alcoholic, troubled childhood. | Defendant and victim were drinking together at a bar after which they traveled to a remote area where victim apparently made sexual advances toward defendant. Victim taunted defendant after he refused her advances which prompted defendant to choke victim until blood came out of her mouth. During the ensuing struggle victim and defendant ended up outside of the automobile after which defendant struck victim with a board and later repeatedly ran over her with the automobile. Defendant then burned the body of the victim with lighter fluid and charcoal. | Fixed life. | Affirmed. |
| *State v. Rhoades*, ___ Idaho ___, ___ P.2d ___ (Baldwin case) Supreme Court No. 1991–126 (Filed 9/12/91). | Thirty-one-year-old male; unmarried; lived with parents; dropped out of school in ninth grade; physical problems caused by polio; worked in processing plant and drywall construction; abused alcohol and drugs; having physical difficulties on night of arrest; assumed to be result of drugs or intoxication. | Kidnapped female convenience store clerk, drove to secluded area where Rhoades attempted to attack her and later shot her as she was crawling away, left victim for dead. | Convicted of first-degree murder, kidnapping, robbery and use of a firearm. Death penalty imposed. | Affirmed. |
| *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680, Supreme Court No. 1991-5 (Filed 1/15/91). | Previously convicted of criminal sexual conduct and manslaughter in other states. Sociopath exhibiting "explosive features," violent individual, expressed no remorse, history of violent behavior. | Pizzuto robbed and murdered woman and her adult nephew in their cabin with a hammer, one of the victims was also shot, victims were buried in a shallow grave near the scene of the murders. | Convicted of first-degree murder, felony murder, robbery. Death sentence imposed. | Affirmed. |
| *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990). | Troubled childhood, addiction to cocaine, psychiatric evidence indicating lack of mental responsibility. Committed various crimes to support chemical dependency. | Defendant planned robbery of victim's grocery store in order to get money to buy cocaine. Defendant hid in store where he was later confronted by victim, a struggle followed during which defendant shot victim in the stomach. Defendant told victim that if she opened the safe, he would call an ambulance. Victim opened the safe after which defendant placed a rifle to her head and shot and killed her. | Convicted of first-degree murder and robbery, sentenced to determinate life sentence on first-degree murder, indeterminate life sentence on robbery and enhancement of 10 years for use of firearm. | Judgment of conviction affirmed, sentence imposed, remanded to trial court with instruction to impose sentence with defendant present. |

| | | | | |
|---|---|---|---|---|
| *State v. Paz*, 118 Idaho, 542, 798 P.2d 1 (1990), *cert. denied* ___ U.S. ___, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991). | Prior manslaughter conviction in Oregon, showed no rehabilitation after previous fines, probation, incarceration and parole, high probability that Paz would remain unpredictable and irrational in overreacting to confrontation and likely to kill fellow inmates if imprisoned. | Shot and killed victim in restaurant after earlier engaging in verbal exchange with victim and two of victim's companions, companions seriously injured in shooting. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Smith*, 117 Idaho 891, 792 P.2d 916 (1990). | Chemical dependency, dominated by his brother (deceased accomplice), various prior criminal activity and outstanding warrants. | Body of victim was discovered in a partially burned stolen Cadillac. Later, .22 and .38 caliber bullets were removed from the victim's body and fingerprints of defendant were found in the Cadillac. | Convicted of first-degree murder, robbery, and third-degree arson. Fixed life sentence on conviction of first-degree murder and consecutive fixed-life sentence on robbery conviction. | Affirmed. |
| *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989), *cert. denied* ___ U.S. ___, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990). | Aggressive antisocial personality prone to violence. | Defendant and brother robbed and murdered retired marine officer and wife while camping in Idaho County, victims held at gunpoint and killed with multiple blows to the skull from night stick. | Convicted of two first-degree murders, death penalty imposed. | Affirmed. |
| *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), *cert. denied* ___ U.S. ___, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989) and ___ U.S. ___, 110 S.Ct. 290, 107 L.Ed.2d 270 (1989). | Defendant had previously committed several violent acts towards victim (his ex-wife), purchased rifle used in killing days before shooting. | Defendant repeatedly shot former wife with .22 caliber rifle outside of her home. | First-degree murder. Death penalty imposed. | Conviction affirmed, sentence vacated because of consideration of victim impact statement, and remanded for resentencing. |

| Case | Mitigating Factors | Facts | Conviction/Sentence | Disposition |
|---|---|---|---|---|
| *McKinney v. State*, 115 Idaho 1125, 772 P.2d 1219 (1989), *cert. denied* ___ U.S. ___, 110 S.Ct. 3292, 111 L.Ed.2d 800 (1990). | Defendant claimed he was physically and sexually abused by his father as a child. | Defendant and female companion devised a plan to rob and kill victim, a recent acquaintance, lured victim into the desert and shot execution style. *See McKinney* below. | Along with first-degree murder also convicted of conspiracy to commit murder, robbery and conspiracy to commit robbery. Death penalty imposed | Affirmed. |
| *State v. Fetterly*, 115 Idaho 231, 766 P.2d 701 (1988), *cert. denied* 492 U.S. 925, 109 S.Ct. 3262, 106 L.Ed.2d 607 (1989). | Prior criminal record. | Along with co-defendant Windsor, was convicted of first-degree murder, burglary and grand theft for the robbery and stabbing death of the victim who they later dumped in the Snake River. | Along with murder, convicted of burglary and grand theft. Death penalty imposed. | Affirmed. |
| *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied*, 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986). | No formal criminal record or history of prior criminal activity, defendant cooperative, skills and ability which indicate defendant may ultimately be capable of maintaining employment and functioning as a productive member of society, troubled childhood. | Along with co-defendant Fetterly, was convicted of first-degree murder, burglary and grand theft for the robbery and stabbing death of the victim who they later dumped in the Snake River. Windsor did not commit actual act of stabbing victim. | First-degree murder. Death penalty imposed. | Sentence of death vacated because sentence was excessive and disproportionate. |
| *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied*, 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986). | No history of violent criminal conduct, inadequate upbringing, age 18 at the time of crime (mental age was 13.8 years), failed to develop mature responses to stressful situations. | Defendant and co-defendant (Beam) were involved in the rape and subsequent murder of a 13-year-old female victim, the victim was drowned and throat was slashed, jury indicated that defendant committed only attempted rape and did not directly commit the crime of murder, defendant reported crime to the police. | Convicted of first-degree murder and attempted rape, sentenced to death. | Sentence vacated, sentence of death was excessive and disproportionate to penalty imposed in similar cases. |
| *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985). | Defendant engaged in abuse of other women and their minor children prior to relationship with present girlfriend and her son, defendant had committed at least three prior rapes along with numerous examples of other violent behavior. | Defendant convicted in the beating death of a three-year-old boy, the son of his live-in girlfriend, evidence of numerous incidences of physical abuse of victim prior to death. | Convicted of murder by torture in first-degree. Death penalty imposed. | Affirmed. |

| | | | | |
|---|---|---|---|---|
| *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). | *See Fetterly above.* | | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986) and 489 U.S. 1073, 109 S.Ct. 1360, 103 L.Ed.2d 827 (1989). | The defendant abused drugs, was on parole for burglary when the murder was committed, had been exposed to and participated in prior sexually deviant behavior, had tortured animals, was impulsive, and lacked any adequate conscience. | The victim, a thirteen-year-old girl, was handcuffed and raped, semen was found in her vagina and rectum, the victim's throat was slashed and the cause of death was listed as drowning. | Convicted of first-degree murder, rape, death penalty imposed. | Affirmed. |
| *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985). | Evidence was admitted indicating defendant's behavior and thinking were suggestive of organic brain disfunction possibly caused or enhanced by a severe head injury from a motorcycle accident, defendant was viewed as being good natured and eager to please, hypersuggestable to the influence of others, reading and writing problem although not retarded, 10th grade education. | Victim, a female cashier who was acquainted with defendant and Sivak was shot several times and stabbed numerous times while working at gas station, victim was also sexually assaulted, defendant along with co-defendant (Sivak) robbed store. | Defendant was convicted of first-degree murder and robbery, sentenced to two consecutive fixed-life sentences. | Reversed and remanded for new trial because of various errors at trial. |
| *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984). | At the time of the incident the defendant was calm, refused to aid the victim or seek help and began planning a cover-up of his involvement, passed criminal record including charges of child abuse and assault with a deadly weapon, lack of remorse over death of victim, no further description provided. | Victim, eight-month-old child and daughter of defendant's female roommate died from severe blows to the head administered by defendant while victim was in bathtub. | First-degree murder. Death penalty imposed. | Affirmed. |

| | | | |
|---|---|---|---|
| *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984), *cert. denied,* ___ U.S. ___, 110 S.Ct. 3292, 111 L.Ed.2d 800 (1990). | Defendant and female co-defendant (Small) were traveling from California through Idaho planning to hitchhike through Montana or Canada, no further description of defendant provided. | Defendant repeatedly shot victim, a recent acquaintance, with .22 caliber pistol after driving to an abandoned gravel pit presumably for target practice, victim was also robbed and car was stolen. The killing was done in a cold-blooded and callous fashion, sole motive was monetary gain, victim shot in the body and killed, execution style. | Convicted of first-degree murder, conspiracy to commit murder, robbery, and conspiracy to commit robbery, death sentence imposed. | Affirmed. |
| *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984). | Member of Spokane motorcycle gang, no further description provided. | Male and female victims, who both were acquainted with co-defendants, were seen together before their van was later seen driving up a sparsely populated mountain road in Idaho. Three men were later seen leaving the sparsely populated area, included in the three men was defendant. The bodies of victims were later found. Male had been beaten severely around the head, female had been strangled and placed in a stream bed, it was determined that male was killed in Washington while female was killed in Idaho. Defendant was acquitted of the murder of male and extradited to Idaho for the murder of the female. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984). | Extensive prior criminal record, capable of manipulation, remorse is questionable, background includes extensive use of drugs and/or alcohol, not able to cope with pressure and may act out against society again, dishonorable discharge from service, uncooperative while on prior probation. | *See Paradis* above, defendant acquitted in murder of male, extradited to Idaho for murder of female. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); 112 Idaho 197, 731 P.2d 192 (1986); 119 Idaho 320, 806 P.2d 413 (1990). | Defendant by prior conduct and conduct in the commission of the murder at hand has exhibited a propensity to commit murder which will probably constitute a continuing threat to society, defendant dominated his co-defendant, defendant had previously worked at the gas station and knew victim, had expressed prior animosity. | *See Bainbridge* above. Defendant was found to have delivered the death blows to victim. | Convicted of first-degree murder, robbery, possession of a firearm during commission of felony, death penalty imposed. | Sentence vacated on procedural grounds; remanded for resentencing. |

| Case | Facts | Charge/Sentence | Disposition |
|---|---|---|---|
| *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). | Defendant previously convicted of other murders, exhibited utter disregard for human life, propensity to commit murder, under sentence for first-degree murder at the time of his actions. | While working as a janitor in prison, defendant engaged in argument with a fellow inmate. Defendant struck fellow inmate with sock containing batteries causing severe head injury and ultimate death of victim. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983). | Married, two children, heroin user. | Defendant and male victim had been drinking together in a local bar, defendant and victim left and went to victim's home, the body of the victim was found approximately three days later in his home, victim died from multiple stab wounds including numerous slashes to the throat. Defendant and his wife fled to California, were later arrested and extradited to Idaho. | First-degree murder. Fixed life. | Affirmed. |
| *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, *cert. denied,* 461 U.S. 984, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983). | Wife of victim, user of prescription drugs and alcohol. | Although it was initially suspected that victim had been murdered by strangulation during a burglary of victim and defendant's home, defendant later convicted in the contract killing of her husband. | First-degree murder. Indeterminate life sentence. | Affirmed. |
| *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982). | Defendant had a history of family and physical problems which inhibited his ability to learn, verbal skills tested in the dull normal range, I.Q. tested in the dull normal to high normal range, psychiatrist report indicated defendant was competent to stand trial, defendant had an aversion towards homosexuals. | Victim, a homosexual male, was stabbed 33 times, defendant claims victim made homosexual advances towards him, defendant took and sold some of the victim's property after the murder. | Convicted of grand larceny and first-degree murder. | Defendant appeals conviction for first-degree murder, affirmed, sentence not specified in opinion. |

| Case | | | | |
|---|---|---|---|---|
| *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). | Employed at Pocatello cafe, co-worker of victim, seen together in hotel the day before murder and together in an automobile on the day of the murder. Evidence of intoxication on day of murder, found competent to stand trial, history of antisocial behavior and alcohol/drug abuse. | Defendant and victim, a female co-worker, observed in hotel room the evening before the murder took place, stopped by police officer on the day of the murder after which the police officer instructed victim to drive the automobile because of defendant's intoxicated state, body of victim later found shot three times in the head, once in the shoulder and once in the abdomen, extensive bruising of face and fracture of her nose. Defendant later found in possession of a pistol with blood on his vest, chest and boots, blood in automobile, victim found partially clothed along side of a road. | Defendant pled guilty to first-degree murder, death penalty imposed. | Reversed and remanded for resentencing because of trial court's failure to specify in writing the mitigating factors it considered. |
| *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979). | Wife of victim, prior evidence of violent activity directed at victim. | Body of victim discovered partially burnt, without head and arms, wrapped in a bed sheet and covered by a door. Death of victim caused by either gun shots, decapitation, or a slit throat. | First-degree murder. Sentence of life imprisonment. | Affirmed. |
| *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979). | Very intelligent and educated, construction engineer, hired by former employer to kill his wife in order to collect insurance proceeds. | Lured victim to remote area under false pretext, beat victim on the head with a 2 × 4 wooden club, victim able to climb into the back of her car and lock the doors, defendant shot victim to death through the closed window of the car. | Death penalty imposed. Also found guilty of lesser included offense of second-degree murder. | Sentence and first-degree murder conviction set aside, second-degree murder conviction imposed, case remanded for re-sentencing because of unconstitutional language of statute requiring death penalty in first-degree murder cases. |

**460**

BISTLINE, Justice dissenting.

1. THE REPEAL OF THE INSANITY DEFENSE VIOLATES DUE PROCESS.

Even though a majority of this Court, as presently constituted, entertains the view that the legislative abolition of the insanity defense violates constitutional due process, this Court reaffirmed the opposite holding in *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990). The doctrine of *stare decisis* does not allow such a result.

> Stare decisis is not a confining phenomenon but rather a principle of law. And when the application of this principle will not result in justice, it is evident that the doctrine is not properly applicable.

*Smith v. State*, 93 Idaho 795, 801, 473 P.2d 937, 943 (1970). Stated bluntly, it appears that not everyone who accepts and adheres to *stare decisis* perceives that allowing the defendant to be executed in violation of the constitution will result in justice. If it is so perceived, then I submit that the well-reasoned views so recently expressed in *Searcy*, 118 Idaho at 639–53, 798 P.2d at 921–35, (Johnson, J. dissenting, McDevitt, J. dissenting), should rule in Card's case.

A more "compelling and cogent reason" to depart from an unconstitutional legislative rule which is less than a year old does not readily come to mind. With three members of the Court being of the same view, there is no basis for not putting the state of the law back where it was prior to *Searcy*. It appears that three other cases will be affected: one case currently pending before this Court, one well-publicized trial just concluded, and Searcy's case. Furthermore, Justice Johnson's *Searcy* dissent served to put the trial bench and bar on notice that the issue was not permanently concluded by the *Searcy* decision:

> I am aware that there are other death penalty cases that will be argued before this Court within a matter of days that will again raise the issue of the unconstitutionality of the abolition of the insanity defense. Because the insanity defense is

fundamental and because of the awesomeness of death penalty cases, I announce to my brethren on this Court today that I will be prepared to address this issue again in these future death penalty cases, despite the ruling of the Court in this case.

*Searcy*, 118 Idaho at 640, 798 P.2d at 922. The overruling of *Searcy* will simply return the criminal law to the status which it has forever had since this nation was founded.

2. THE EIGHTH AMENDMENT FORBIDS THE EXECUTION OF AN INSANE PERSON

Moreover, Card raises an issue that was not addressed in *Searcy*. Card argues that it is a violation of the eighth amendment to abolish the insanity defense because as the law now stands an insane person could be sentenced to death. It is established that the eighth amendment bars the execution of someone who, by reason of mental illness, cannot comprehend the reason for the penalty or its implications. *Ford v. Wainwright*, 477 U.S. 399, 417, 106 S.Ct. 2595, 2606, 91 L.Ed.2d 335 (1986). Moreover, the Supreme Court has strongly suggested that executing those unable to appreciate the wrongfulness of their actions would violate the eighth amendment.[16] *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 2954, 106 L.Ed.2d 256 (1989):

> The common law prohibition against punishing 'idiots' for their crimes suggests that it may indeed be 'cruel and unusual' punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions. Because of the protections afforded by the insanity defense today, such a person is not likely to be convicted or face the prospect of punishment.

Of course, Card was not given the protections of the insanity defense.

The majority holds that the eighth amendment is not offended because "Idaho Code § 19–2523 specifically requires the

---

**16.** The lack of a substantial ability to appreciate the wrongfulness of an act was part of the definition of legal insanity prior to the passage

of I.C. § 18–207. *State v. White*, 93 Idaho 153, 158–60, 456 P.2d 797, 802–04 (1969).

sentencing court to consider 'the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the offense charged.'" The flaw in the majority's logic is that I.C. § 19–2523 only requires the trial court to *consider* the effect of the defendant's mental illness. It does not require the court to spare the life of a mentally ill offender, unable to appreciate the wrongfulness of his actions. Under the provisions of I.C. § 19–2515(c), the court may order the execution of someone unable to appreciate the wrongfulness of his actions or to conform his conduct to the law, if the court considers that fact and finds that it does not outweigh the aggravating factors. This statutory scheme violates the eighth amendment. *Penry,* 492 U.S. at 332, 109 S.Ct. at 2954, *Ford,* 477 U.S. at 417, 106 S.Ct. at 2606.

But, assuming arguendo that *Searcy* was decided correctly and should remain the law, we nevertheless should hold that an individual who could not appreciate the wrongfulness of his actions or could not conform his conduct to the requirements of the law at the time of the offense charged may not be executed.

### 3. THE COURT'S CONSIDERATION OF THE VICTIM IMPACT STATEMENT IS REVERSIBLE ERROR.

There are two problems with the majority's analysis in the discussion of the victim impact statement. First, *Payne v. Tennessee,* 498 U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), should not apply to this case, even in part, because that case was not the law at the time of sentencing here. Second, the error in considering the statement was not harmless.

#### *Payne does not apply here.*

The Court today applies the rule in *Payne* to this case in an attempt to partially excuse the trial court's violation of clearly established law. *Payne* was issued on June 27, 1991, well *after* the imposing of sentence in Card's case. It is undisputed that *State v. Charboneau,* 116 Idaho 129,

774 P.2d 299 (1989), and *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), were the controlling cases at the time of Card's sentencing. The opinion in *Payne,* overruling *Booth* in part, was completely unforeseeable. Until *Payne* was issued it was clear that victim impact statements could not be considered at a capital sentencing hearing. Both parties at trial and the judge knew that. So too, every member of this Court as well as the Solicitor General concedes that at the time of the sentencing hearing such evidence could not be properly considered.

Although the majority seems to assume that *Payne* applies here, such is not necessarily the case. We have refused to apply federal decisions retroactively before and should do so in this case. *See, e.g., Ratkowski v. Ratkowski,* 108 Idaho 355, 699 P.2d 1369 (1985), *and Nieman v. Nieman,* 105 Idaho 796, 673 P.2d 396 (1983). The prospective or retroactive application of a decision is a discretionary determination of judicial policy made by this Court after balancing certain criteria. The Court must weigh:

1. The purposes of the new rule;
2. Reliance on prior decisions by the Court; and
3. The effect of the new rule on the administration of justice.

*State v. Whitman,* 96 Idaho 489, 491, 531 P.2d 579, 581 (1975).

Here, the new rule does not serve a particular purpose. The Supreme Court merely noted that victim impact statements might be considered relevant by some and held there was no absolute constitutional bar.

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." [*Payne v. Tennessee,* 498 U.S. at ——, 111 S.Ct. at 2609] If, in a particular case, *a witness' testimony or a prosecutor's remark so infects the sentencing procedure as to render it fundamentally unfair, the defendant may seek relief*

*under the Due Process Clause of the Fourteenth Amendment.*

*Payne,* 498 U.S. at ——, 111 S.Ct. at 2615 (emphasis added) (O'Connor, J. concurring joined by White, J. and Kennedy, J.).

It is also noted that the state does not claim it needed such evidence in order to obtain a death sentence. Rather, it asserts the error was harmless. Thus, the state admits that limiting the application of the rule would not disadvantage it; there is no other compelling reason to apply the rule retroactively.

The second *Whitman* factor also favors limiting the application of *Payne.* Card had the right to rely on the clear rulings of the United States Supreme Court and this Court. At the time of Card's sentencing, we had already clearly announced that victim impact statements were prohibited in Idaho. *Charboneau,* 116 Idaho at 149–50, 774 P.2d at 319–20. That holding was mandated by the Supreme Court's earlier decision in *Booth v. Maryland.* The trial court was aware of the law, but chose to ignore it to Card's detriment. The State should not be rewarded, nor Card punished, for the trial court's indifference to controlling precedent.

As to the third factor, there will be an adverse effect on the administration of justice if *Payne* is applied retroactively. If Card's defense counsel could have predicted that the Supreme Court would partially overrule its then only two year old decision in *Booth* less than two years later, he could have taken steps to militate the emotional effect of the victim impact statement. Application of the *Payne* rule to this case would work an injustice because Card has not had an adequate opportunity to address the implications of the case before any court.[17] On the other hand, it is not unjust to require the state and the trial court to adhere to controlling precedent *until* it is overruled. To the contrary, it is their sworn duty to do exactly that.

---

17. Oral argument in this case was heard on March 13, 1991. *Payne* was not issued until June 27, 1991.

*The error is not harmless.*

It is claimed by the majority that the error was harmless because the trial court did not consider the improper evidence. The court's comments indicate otherwise. (The comments are set forth again for the reader's convenience.)

I find it interesting, but an apparently factual part of the law in the State of Idaho today, and not only the State of Idaho but under the Federal Court edict through the Federal system, that when something like this occurs, they take the position that the survivors or family members of the victim are not permitted to make statements or testify to the Court concerning the effect upon the family that this homicide has had.

They say that would prejudice the judge or jury in those states where the jury is involved and cause that person or group of persons to make an irrational decision, to reach conclusions that would be based solely on emotion rather than a review of the facts. However, it is perfectly appropriate for the perpetrator of the crime to have his family's support and members come forth and speak in his behalf. There is not a prohibition against that. I find that strange myself, but that seems to be the state of the law.

There can be no spokesman here for Eugene and Shirley Morey. The silence is deafening where they are concerned.

Although the court correctly notes that the victim impact statements could not be considered, the comments of the court as to the correctness of the decisions and the proper role of the federal judicial system rather clearly portray that it was in fact influenced by the statements of the family members. Not in the least doubting the court's sincerity and integrity, seemingly the court, out of kindness and sympathy for the bereaved, was brought to seeing himself as a panacea for the Moreys who undoubtedly perceived that they should have been allowed to speak. Heretofore, and over a long period of time, both former

Justice Huntley and myself have argued the unfairness of placing on one single individual, the trial judge, the responsibility of imposing the death penalty. Far better, we have said, that the awesome responsibility should be placed where it was when Idaho evolved from a territory into a state, namely, in the hands of a jury of twelve who are the peers of the defendant.

In *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990), this Court adopted a harmless error test which stated simply, "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Paz*, 118 Idaho at 557, 798 P.2d at 15, *quoting Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We also warned that:

> This decision should not be interpreted in any fashion to condone or permit victim impact statements in capital cases. Victim impact statements are clearly proscribed by *Booth v. Maryland* and *State v. Charboneau*. It is a rare capital case where the inclusion of a victim impact statement will not fatally flaw the entire sentencing procedure.

*Paz*, 118 Idaho at 558, 798 P.2d at 17. In the very next year following that statement of judicial policy, we thrice held the same error was harmless. *State v. Rhoades*, 120 Idaho 795, 820 P.2d 665 (1991); *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680, 701 (1991); *State v. Fain*, 119 Idaho 670, 809 P.2d 1149, 1152 (1991); *see also Searcy*, 118 Idaho at 637, 798 P.2d at 919 (no error for the court to consider victim impact statement where the eventual sentence was life imprisonment). Where are we today? District courts may well question the law as announced by this Court, and be hesitant to apply it full well knowing that this Court has done likewise.